UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ROBIN BARNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-CV-616 JD |
| | ) | |
| ZIMMER BIOMET HOLDINGS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This is an employment discrimination case arising out of Plaintiff Robin Barney's

resignation from her post as a Senior Vice President for Defendant Zimmer Biomet Holdings

("Zimmer"). Based on several events that occurred shortly before and after her resignation, Ms.

Barney filed a lawsuit, claiming that Zimmer discriminated against her because she was a

woman by ordering her to commit illegal acts, threatening to fire her if she refused, forcing her

resignation, and then denying her severance benefits. On July 11, 2017, Ms. Barney filed a

charge of gender discrimination with the EEOC based on being constructively discharged and

Zimmer withholding substantial severance pay and benefits. She then filed this suit on August

11, 2017.

### I.    Procedural Background

This case has a long procedural history, some of which is helpful to repeat here. Based on

several events that occurred shortly before and after her resignation, Barney filed a lawsuit,

alleging sex discrimination, breach of contract, and constructive discharge. In this suit, Ms.

Barney filed three amended complaints [DE 1; 16; 27] and Zimmer filed a partial motion to

dismiss seeking dismissal of Ms. Barney's contract and constructive discharge claims made in

the Third Amended Complaint. [DE 30]. This Court granted Zimmer's partial motion to dismiss and, specifically, granted the motion to dismiss Ms. Barney's breach of contract claims and constructive discharge claim. [DE 67]. Shortly after the Court's decision, Ms. Barney moved to amend or correct her complaint in a Fourth Amended Complaint filed on December 6, 2018. [DE 69-1]. The magistrate judge denied in part Ms. Barney's motion for leave to file the proposed and updated constructive discharge claim as part of her Fourth Amended Complaint. [DE 80]. Shortly thereafter, Ms. Barney filed an objection to the magistrate judge's decision [DE 82], but two weeks later she withdrew it. [DE 83].

On May 2, 2019, Ms. Barney filed a new complaint in Marion Superior Court, Indiana, asserting the same constructive discharge claim the Court had dismissed in this case—*Barney I*. Zimmer subsequently removed the state complaint to the U.S. District Court for the Southern District of Indiana, thereby opening a new case in the federal system—*Barney II*.[1] Zimmer then moved to transfer the case to the Northern District of Indiana, where *Barney I* was pending before this Court. [DE 12 in *Barney II*]. On August 26, 2019, *Barney I* and *Barney II* were consolidated without objection. Zimmer then filed a motion to dismiss Ms. Barney's First Amended Complaint from *Barney II*, again seeking dismissal of her constructive discharge claim. [DE 98].

In its previous order [DE 118], this Court found that since Ms. Barney failed to appeal or seek reconsideration of the denial of her motion to amend the constructive discharge claim decision by the magistrate judge, she was precluded from seeking review of the claim a second time. Ms. Barney had an opportunity to seek this Court's review of the magistrate judge's decision but withdrew her objection and thus her opportunity for review before filing the

---

[1] The case number for *Barney II* is 3:19-cv-00546.

constructive discharge claim in state court. [DE 82]. The Court explained that Ms. Barney's litigation decision to withdraw her objection to the magistrate judge's order and pursue her claim in another forum did not create good cause for this Court to review the amended complaint again. *See Arrigo v. Link*, 836 F.3d 787, 798 (7th Cir. 2016). When withdrawing her objection to the magistrate judge's decision, Ms. Barney stated that she was electing "not to pursue her objection to the Magistrate Judge's Order [Dkt. 82] and has further elected to proceed in this case with the Third Amended Complaint as the operative complaint." [DE 83 at 2]. At that point, Ms. Barney committed to her theory of the case and the Court dismissed her First Amended Complaint in *Barney II* alleging constructive discharge.

Now before the Court is the Defendant's Motion for Summary Judgment [DE 130] and supporting memorandum [DE 131], both filed on October 27, 2020 in which it seeks dismissal of Ms. Barney's Title VII and EPA claims. For the following reasons, the motion for summary judgement is granted.

## II.   Factual Background

In 2007, Ms. Barney became the Senior Vice President of Operations at Biomet, reporting directly to Biomet's CEO. Ms. Barney's employment at Biomet was governed by an agreement which provided for the payment of enhanced severance benefits if her employment was terminated without "Cause" or if she resigned for "Good Reason" within twenty-four months of a "Change in Control" or "CIC" (a change in the ownership of Biomet). In 2014, Biomet and Zimmer announced they were merging, and that Ms. Barney would be one of three females on its twelve-member Operating Committee. [DE 136 at 2]. Once the companies formally merged, Ms. Barney became Senior Vice President of Global Operations and Logistics, reporting directly to Zimmer's CEO, David Dvorak. As a part of the merger, top executives such

as Ms. Barney were offered jobs with Zimmer and received a one-time restricted stock unit award equivalent to the Biomet CIC cash severance payment that would inure two years after the merger in July of 2017.[2] Under this agreement and her new agreement with Zimmer in 2014, Ms. Barney was only entitled to these benefits if she resigned for "Good Reason" and executed a release after two years following the merger. Neither party claims that Ms. Barney resigned for "Good Reason" as defined by the Biomet CIC Agreement. Ms. Barney was also eligible for severance benefits if she met the requirements under Zimmer's Restated Severance Plan. [DE 133-37 at 675]. Of the executives who made the switch from Biomet to Zimmer, six were male and one (Ms. Barney) was female. Ms. Barney's acceptance of the new position at Zimmer was described as "the biggest get" as she was someone who was viewed as "royalty" in the healthcare and medical device field. [Ex. E, Fisher Dep. 84:21-85:13].

In her new role, Ms. Barney was responsible for supply chain, operations, and logistics, including manufacturing, distribution, procurement, and planning at all Zimmer sites. [DE 132 at 4]. Ms. Barney and Dave Kunz, Senior VP of Global Quality, Regulatory, and Clinical Affairs, were responsible for bringing new products to plants in addition to producing and shipping product manufactured by Zimmer. On Monday, September 12, 2016, the FDA arrived unannounced at the Zimmer North Campus for an audit of the manufacturing site. Although FDA audits are not unusual and are expected on a somewhat biannual basis, Ms. Barney testified that this audit was intense, all consuming, and adversarial. [Ex. 10, Barney Dep. 441:6-19]. As a result of the audit, Mr. Kunz placed a shipment hold on all products coming from the Zimmer

---

[2] Ms. Barney's employment offer from Mr. Dvorak explicitly states the following: "[Y]ou must waive your right to the cash severance benefits to which you would have been entitled under the Biomet CIC Agreement in the event you terminate your employment during the two years following transaction close for Good Reason (as defined in the Biomet CIC Agreement) . . . ." [DE 132-4 at 4]. The offer letter explained that Ms. Barney would receive a one-time award approximately equivalent to the value of the CIC cash severance payment provided in the Biomet CIC Agreement two years after the merger contingent upon her continued employment.

North Campus, which impacted products manufactured elsewhere. [Ex. G, Kunz Dep. 41:11-42:24]. Thus, the FDA audit caused supply problems, which also resulted in creating severe sales issues for Zimmer. [Ex. D, Barney Dep. 320:4-19, 445:8-13]. Ms. Barney provided frequent updates to the Operating Committee about these issues and key performance indices related to manufacturing.

During this time period, Ms. Barney's relationship with Mr. Dvorak, the CEO, deteriorated. Prior to this point, Ms. Barney had already recognized that she was not a part of an "inner circle" of male executives with whom Mr. Dvorak met with regularly. [Ex. 10, Barney Dep. 232:20-233:18]. Ms. Barney testified that Mr. Dvorak regularly made demeaning comments towards her during the Operating Committee meetings such as offering to provide her with private tutoring so that she could better understand business strategy. [*Id*. at 406:16-407:11]. He did this even though Ms. Barney was extremely well-respected in her field and was described as tough, having a lot of swagger, knowing her business, and providing "great input into the senior meetings." [Ex. E, Fisher Dep. 197:6-17]. Mr. Terry Martin, the Senior Director of Facilities and Maintenance, also testified to attending two meetings with Ms. Barney and Mr. Dvorak where he observed Mr. Dvorak become unhappy and aggressive with Ms. Barney after she challenged him. [Ex. F, Martin Dep. 190:22-192:1-12]. Mr. Martin related that he felt uncomfortable in the meetings but never confronted Mr. Dvorak about his treatment of Ms. Barney. [*Id*. at 192:1-12]. Mr. Martin also testified that the Zimmer side of the newly merged Zimmer-Biomet organization was not culturally prepared for a woman to be in Ms. Barney's position, especially within the Operations group. [*Id*. at 65:5-15; 95:10-15; 223:10-227:17].

During the week of October 11, 2016, as the FDA audit continued, Mr. Kunz informed Mr. Dvorak that he was planning to terminate two employees due to performance issues. [Ex. 12,

Kunz Dep. 49:5-52:11]. Ms. Barney felt pressure from Mr. Dvorak to make organizational changes within her department, which she understood to mean that he wanted her to fire some of her employees. [Ex. D, Barney Dep. 365:3-16, 453:17-454:18]. Over the next week, Ms. Barney was under increased pressure from a variety of sources. By October 14, Ms. Barney had to miss an Operating Committee meeting due to being physically ill from anxiety and lack of sleep. [Ex. E, Fisher Dep. 157:2-11]. During this same week, Daniel Florin, CFO of Zimmer, communicated to Ms. Barney that she needed to come up with a good story for investors to explain the sales shortfalls on the upcoming shareholders' call. [Ex. D, Barney Dep. 414:5-418:18]. It was Ms. Barney's understanding that the CEO and CFO did not want to communicate to the shareholders about Zimmer's production shut down or the persistent supply chain issues. [*Id*. at 66:21-67:11]. Ms. Barney testified that she refused to come up with a story. On October 26, Ms. Barney provided proposed organizational changes that did not include terminations to Mr. Dvorak, but he did not view her proposal to be sufficient in making the necessary changes he required.

On October 28, 2016, Mr. Dvorak directly asked Ms. Barney to terminate two employees within her organization. [Ex. D, Barney Dep. 75:19-76:9, 76:19-79:1]. Ms. Barney communicated to him that she refused to fire employees who did not warrant termination and stated that "the only head you have left to get is mine." [*Id*. at 367:13-23]. Ms. Barney testified that Mr. Dvorak was furious, told her that this was unacceptable, and that he wanted more from her. It was following this conversation that Ms. Barney drafted her resignation email. She testified that she felt she was being asked to do things that were unethical, immoral, and illegal. [*Id*. at 428:17-432:5; DE 133-27]. Since the shareholder meeting was scheduled for the following week, Ms. Barney felt she had no choice and that she had to take immediate action. [Ex. D, Barney Dep. 55:7-20].

6

Later that morning, Ms. Barney sent her resignation email to employees in the HR department, Jack Heeter and Bill Fisher. [DE 133-27]. In the email Ms. Barney states the following, "Effective November 11, 2016 (or sooner if you choose), I will resign from Zimmer Biomet. I feel that this action on my part is necessary and the right thing to do for the company." [*Id*.]. Ms. Barney testified that she sent the email to HR instead of to Mr. Dvorak, in order to give them time to reach out and ask her to stay or to negotiate an exit deal. [Ex. D, Barney Dep. 458:5-23]. Instead of reaching out to her, Mr. Fisher immediately communicated her resignation to Mr. Dvorak. [Ex. E, Fisher Dep. 88:16-89:4]. Mr. Fisher testified that he was shocked Ms. Barney resigned as she was approaching two significant payment dates—the Biomet CIC payout and retirement eligibility. [*Id*. at 80:2-82:25]. Moreover, under Zimmer's Restated Severance Plan, Ms. Barney was not eligible for a severance package. Employees, such as Ms. Barney, were not eligible to receive severance benefits unless they (1) were notified in writing that their employment was terminated; (2) signed the general release within the time period specified; (3) executed a confidentiality, intellectual property, non-competition and/or non-solicitation agreement; and (4) worked through the scheduled termination date. [DE 133-37 at 6675-76]. These benefits represented a significant amount of money for Ms. Barney—the restricted stock units amounted to two years of base salary pay and two years of bonus at 100% of earn out, which would have become available to Ms. Barney in July of 2017 (in about eight months). [Ex. E, Fisher Dep. 81:14-82:14]. Ms. Barney was also only six months away from being able to retire and take the stock options with her. [*Id*. at 82:15-25]. Following her resignation, Mr. Fisher and Mr. Heeter confirmed that she would not receive her Biomet CIC benefits or a Zimmer severance package. Neither reached out to Ms. Barney to discuss this with her.

Mr. Dvorak also did not reach out to Ms. Barney immediately but instead accepted her resignation on November 1, 2016, the day after the shareholder call. [DE 136-11]. During the earnings call, neither Mr. Dvorak nor Mr. Florin told the shareholders about the production shut down due to the FDA audit.[3] Zimmer also provided the FDA with a list of employees who were let go due to necessary changes that were being made as a result of the audit and Zimmer noted on it that Ms. Barney "ceased to serve in this position on November 2, 2016 and she has left the company." [DE 136-14; 132-22 at 3]. Her resignation was listed as one of the "management changes [that] have been implemented by Zimmer Biomet to address Quality Management System performance issues noted at the Warsaw North Campus, along with underlying quality culture issues now recognized." [DE 132-22 at 3].

Following her resignation, Zimmer did not pay Ms. Barney severance benefits pursuant to the agreements she had in place because she had resigned and left the company before she could access her restricted stock units. Notably, Mr. Fisher testified that an employee who voluntarily resigns is not entitled to severance benefits under the company's Severance Plan. [DE 133-37 at 675-76]. Ms. Barney argues that five of seven former Biomet executives received CIC severance and she was one of two who did not. On November 28, 2016, Ms. Barney sent a letter to Mr. Dvorak stating the following: "I believe that my employment with the company was effectively terminated by the company, without cause, and that I am entitled to the value of my Biomet CIC payout." [DE 132-23]. Ms. Barney also claims that two former Biomet executives, Stuart Kleopfer and Wil Boren, received some form of payment or severance when they left Zimmer. [DE 136 at 25].

---

[3] On December 2, 2016, shareholders filed a securities class action against Zimmer and individual named defendants including Mr. Dvorak and Mr. Florin. As a result of the suit, Zimmer offered up to $50 million to pay class members' claims, which was approved on May 21, 2020. [DE 251].

Ms. Barney later filed this suit against Zimmer. She argues that she was constructively discharged from her position, and no one at the company tried to get her to stay, tried to help her become eligible for additional benefits, or offered to help her exit from the company so she could receive severance benefits. She initially asserted numerous claims in her Complaint, but only her Title VII and Equal Pay Act claims remain.

### III.     Summary Judgment Standard of Review

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). So, the Court must construe all facts in the light most favorable to the nonmoving party, making all legitimate inferences and resolving all doubts in its favor. *Cung Hnin v. TOA, LLC*, 751 F.3d 499 (7th Cir. 2014). A "material" fact is one the substantive law identifies as impacting the outcome of the suit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). When there is a genuine issue as to any such material fact and a reasonable jury could return a verdict in favor of the nonmoving party, summary judgment is inappropriate. *Id.* Conversely, where a factual record exists that would not allow a rational jury to find for the nonmovant, there is no genuine issue of fact for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.,* 391 U.S. 253, 289 (1968)).

Though the Court must construe the facts in the light most favorable to the non-moving party, she cannot simply rest on the allegations or denials contained in her pleadings: she must present sufficient evidence to show the existence of each element of her case on which she will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the plaintiff is unable to satisfy the legal requirements necessary to establish his or her case, summary judgment

is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## IV.   DISCUSSION

### A.  Barney's Title VII Claim

"Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). "At the summary-judgment stage, the proper question is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action.'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)) (alteration in original).

When reviewing discrimination claims, the Court recognizes that the *McDonnell Douglas* framework analysis is no longer required and is now viewed simply as one way to organize and present a claim of discrimination. The Seventh Circuit has stated that plaintiffs do not have to "rely on the *McDonnell Douglas* method to carry that burden; she may well have other 'direct or circumstantial evidence that supports an inference of intentional discrimination.'" *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020) (citation omitted). Instead, plaintiffs may point to "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll*, 953 F.3d at 929. And as the Seventh Circuit has recognized, "[f]ew discrimination cases are so straightforward—indeed they are often factually complex and require

10

sifting through ambiguous pieces of evidence." *Ortiz*, 834 F.3d at 765.  With a Title VII claim, the "fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014).

Ms. Barney has alleged that Zimmer discriminated against her on the basis of her gender when it forced her resignation, and then denied her severance benefits. Notably, Ms. Barney does not rely on the *McDonnell Douglas* framework to make her gender discrimination argument. But since the Defendants addressed the elements of the framework in their brief, the Court will address the elements as well. [DE 132 at 14-17]. Under this framework, the plaintiff carries the initial burden of establishing a prima facie case of employment discrimination, which can be accomplished by setting forth evidence that (1) she is a member of a protected class, (2) her job performance met the employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff. *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017). If established, this prima facie case creates a presumption of discrimination, and the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer does this, the burden shifts back to the plaintiff to produce evidence that the stated reason is a mere pretext. *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012)).

Thus, though the Court has structured its order in response to the defendants' brief, which still organizes its arguments utilizing the *McDonell Douglas* framework, it does not limit itself to analyzing the claim within the framework by itself and considers all evidence presented by the

11

parties as directed in *Ortiz*. *See also*, *Reymore v. Marian Univ.*, No. 1:16-cv-00102-SEB-DML,

2017 WL 4340352, at *8 (S.D. Ind. Sept. 29, 2017) ("[O]ur understanding is that a district court

need not limit itself to analyzing the evidence only according to the *McDonnell Douglas*

template, nor should it be bound by the formulaic foxtrot which has developed under that

framework."). Thus, the Court analyzes the claim within the framework and considers the claim

in the context of all presented evidence as directed by *Ortiz*. The parties do not appear to

disagree on the first two elements of the framework (that Ms. Barney is in a protected class or

that there were any issues with her job performance), but they do disagree as to whether Ms.

Barney suffered an adverse employment action and whether similarly situated individuals at

Zimmer were treated more favorably than she was. Thus, the Court's analysis will focus on those

two elements in addition to other evidence of discrimination identified by Ms. Barney.

### 1. Whether Ms. Barney Suffered an Adverse Employment Action

Ms. Barney argues that she suffered an adverse employment action in the form of

constructive discharge and that she need not allege egregious sex-based harassment to show

constructive discharge. [DE 136 at 18]. Ms. Barney asserts that constructive discharge occurs

where based on the employer's actions, "the handwriting [was] on the wall and the axe was

about to fall." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008). While the Court

previously addressed Ms. Barney's state law claim of constructive discharge in its order

responding to the motion to dismiss [DE 67], she is advancing this claim under Title VII.

Unfortunately, for Ms. Barney, the claim has little success here. Ms. Barney alleges that she was

forced to resign because she would not mislead investors or inappropriately fire her employees.

But Ms. Barney provides no evidence to support her claim that she would have been fired had

she failed to meet these requests. And, even if Ms. Barney could support these allegations with

12

sufficient evidence, she fails to provide any evidence connecting the constructive discharge to her gender. Simply put, even if these demands were inappropriate there is nothing to suggest they were motivated by her gender.

"Constructive discharge, like actual discharge, is a materially adverse employment action." *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). "But to be actionable under Title VII the work conditions need to be more than merely intolerable—they need to be intolerable in a discriminatory way." *Chambers v. Am. Trans Air, Inc.*, 17 F.3d 998, 1005 (7th Cir. 1994). "The central question is whether the employer would have taken the same action had the employee been of a different [gender], all other conditions remaining the same." *Togba v. Cty. of Cook*, No. 98 C 5756, 2001 WL 1035215, at *6 (N.D. Ill. Sept. 6, 2001) (citing *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 158 (7th Cir. 1996)). The Court's focus is on whether any of the incidents, and other supporting evidence, described by Ms. Barney could support the reasonable inference that the alleged constructive discharge was based on gender discrimination. The Court finds that the evidence does not support such an inference.

Ms. Barney has provided evidence demonstrating that she was placed under significant stress by leadership at Zimmer not only to implement organizational changes by firing employees within her subdivision but also to provide a reason for the sales shortfall on the upcoming investors call. The Court recognizes that Ms. Barney was placed under a significant amount of stress due to these expectations from Zimmer leadership, but it does not find that Zimmer's actions against Ms. Barney were the result of her gender. Even if there was some evidence of a "boys club" [Ex. F, Martin Dep. 172:18-173:8] and that Zimmer had a reputation for being less female friendly than Biomet [*Id*. at 224:14-225:14], the Court does not find these gender-related experiences to have a direct connection to Ms. Barney's resignation. Nor does it

13

find evidence demonstrating Ms. Barney's imminent or inevitable termination. Instead, it seems that the pressure placed on Ms. Barney by Zimmer leadership was related more to her position as head of manufacturing than to her position as a woman. Only a person at Ms. Barney's level within manufacturing could have made the organizational changes desired by the CEO and could have come up with an acceptable explanation for the sales shortfall for investors. And, while it may seem as though Zimmer used the FDA audit to blame legacy Biomet executives for any problems that occurred as many were let go during that time period, again, the animus there would be based on previous employment at Biomet and not on gender.[4]

Finally, there is some evidence that Mr. Dvorak was treating Ms. Barney harshly in her last few months with Zimmer. Ms. Barney testified that she was being excluded from meetings between Mr. Dvorak and other male VPs, that he demeaned her in meetings, and that he was quick to put down her ideas or questions. [Ex. 10, Barney Dep. 406:9-408:22]. Ms. Barney's perspective of Mr. Dvorak's treatment of her was corroborated by Mr. Fisher with whom she complained to in person. [Ex. E, Fisher Dep. 69:2-22]. Mr. Dvorak's aggressive attitude towards Ms. Barney was also corroborated by Mr. Martin who participated in two meetings where Mr. Dvorak's treatment of Ms. Barney made him uncomfortable. [Ex. F, Martin Dep. 190:15-197:8]. But the evidence does not demonstrate that Mr. Dvorak's treatment of Ms. Barney was gender based, as opposed to professional disagreements. And, even if so, such conduct is not sufficient to constitute a hostile environment. *See Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (hostile work environment claim failed where employee alleged that her supervisor "treated her in a rude, abrupt, and arrogant manner, ignored her work-related

---

[4] Mr. Martin testified that he believed legacy Zimmer managers were using the audit to blame legacy Biomet executives for the problems in order to eliminate them. He noted that three legacy Biomet employees (Rex White, Richard Castaneda, and Mikko Matero) were let go towards the beginning of the audit. [Ex. F, Martin Dep. 151:4-152:21]. Ms. Barney was also a legacy Biomet employee.

suggestions and failed to keep her informed about changes at work"). Moreover, Ms. Barney's

reasoning for her resignation is centered upon the investor call and Mr. Dvorak's desire for her to

fire employees in her subdivision. But Mr. Kunz, Ms. Barney's counterpart in operations, had

already fired several employees within his subdivision after receiving pressure from Mr. Dvorak

to make changes. Thus, there is no evidence demonstrating Mr. Dvorak's actions towards Ms.

Barney on these fronts were because of her gender.

The evidence *does* demonstrate that the culture was very male-dominant at Zimmer, or

significantly more so than it was at Biomet, but the evidence does not demonstrate this male-

dominated atmosphere drove Ms. Barney to resign. Even if Ms. Barney could establish that her

working conditions were intolerable because of the pressure from the CEO and CFO, she could

not demonstrate they were made intolerable *because of* her gender. Thus, the Court cannot

determine that a reasonable factfinder would conclude that Ms. Barney's gender caused her

constructive discharge. The Court will address Ms. Barney's severance argument in the next

section.

### 2.   Whether Similarly Situated Individuals Were Treated More Favorably

Ms. Barney also argues that under both Title VII and the Equal Pay Act, she can show

that she was treated less favorably than similarly situated male employees when Zimmer denied

her severance pay. [DE 136 at 24]. "Similarly situated employees must be 'directly comparable'

to the plaintiff 'in all material respects,' but they need not be identical in every conceivable

way." *Coleman*, 667 F.3d at 846 (quotations and citations omitted). If the distinctions between

the plaintiff and the proposed comparators are not "so significant that they render the comparison

effectively useless," the similarly situated requirement is satisfied. *Humphries v. CBOCS West,*

*Inc.,* 474 F.3d 387, 405 (7th Cir. 2007). Normally a plaintiff must at least show that the

comparators (1) "dealt with the same supervisor," (2) "were subject to the same standards," and (3) "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 690 (7th Cir. 2008). Finally, the Supreme Court has stated that "precise equivalence . . . between employees is not the ultimate question." *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 283 n.11 (1976). But the proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision. *Coleman,* 667 F.3d at 841.

Ms. Barney asserts that Zimmer treated similarly situated males more favorably, especially regarding eligibility for receiving severance packages when leaving Zimmer. More specifically, she argues that Stuart Kleopfer and Wil Boren both received severance packages after indicating to the company that they were considering leaving. She claims that both employees were disgruntled with their jobs and "raised their hands to leave" when Zimmer laid out all the options in terms of what it could do for them as they were leaving the company. In contrast, Ms. Barney asserts that when she was allegedly forced to resign, no one at Zimmer tried to get her to stay, help her become eligible for additional benefits, or offered to exit her from the company so that she could receive a severance package. In response, Zimmer argues that Ms. Barney has not identified similarly situated male employees who were treated more favorably than she was.

Like Ms. Barney, Mr. Kleopfer directly reported to the CEO of Zimmer, he was a legacy Biomet senior leader, and he also left the company before he could receive the CIC restricted stock benefit. [DE 136-15; DE 136-3; Ex. E, Fisher Dep. 107:17-21]. Mr. Boren was also another legacy Biomet employee who was offered a position as Vice President and General

Manager Innovative and Marketing Services and Solutions at Zimmer, although Mr. Boren's supervisor was not the CEO. [DE 132-40]. As former Biomet executives, both Mr. Kleopfer and Mr. Boren were eligible for the same restricted stock benefit from the Biomet CIC Agreement as Ms. Barney, and both left within two years of the merger. [DE 132-9 at 13]. Notably, they were all subject to the same rules as defined in the Zimmer Severance Plan and the Biomet CIC Agreement. [DE 133-37 at 2-3; Ex. E, Fisher Dep. 100:5-11]. But this is where the similarities between the employees ends.

Unlike Ms. Barney, Mr. Kleopfer communicated with Zimmer about potentially leaving *before* officially resigning from his position. Mr. Fisher (SVP of Human Resources) testified that it was Mr. Kleopfer who initiated his departure and not Zimmer. [Ex. E, Fisher Dep. 124:19-21]. But before resigning, Mr. Kleopfer met with Mr. Fisher to discuss his options and Mr. Fisher personally tried to persuade him to stay at Zimmer. [*Id*. at 123-24]. Mr. Fisher prepared information for Mr. Dvorak regarding the thresholds for Mr. Kleopfer's bonus, integration bonus, equity, and CIC severance payout levels. [Ex. E, Fisher Dep. 99:18-22]. Mr. Fisher also sent Mr. Kleopfer a memorandum outlining Zimmer's understanding of his transition plan which assumed he would tender his official notice of resignation the next month. [DE 132-31]. Ultimately, Zimmer and Mr. Kleopfer reached an agreement where he delayed his resignation for several months and he received approximately $600,000 in post-employment payments, which Mr. Fisher testified was from his bonus and was not a severance payout. [Ex. E, Fisher Dep. 94:6-25].

Similarly, Mr. Boren also met with Zimmer to communicate that he was unhappy in his position and that his new role was not going well. [*Id*. at 183:7-22]. In response, Zimmer immediately terminated Mr. Boren from his position. Zimmer classified his separation as a

termination of employment "without cause" during the two-years following the merger, which qualified him for CIC severance benefits. [*Id*. at 2]. HR representative Mr. Cultice also testified that Mr. Boren's separation from Zimmer was classified as involuntary without cause. [Ex. J, Cultice Dep. 22:11-18]. Because Mr. Boren's termination was "involuntary without cause," he was eligible for severance pay, which he received in the form of a lump sum payment of over $1.1 million. [DE 132-42 at 6]. But Mr. Cultice testified that Mr. Boren received severance pursuant to the Biomet CIC agreement rather than the Zimmer Severance Plan since he left within two years of the merger being completed. [Ex. J, Cultice Dep. 26:11-16].

When Ms. Barney officially resigned from Zimmer, she sent an email to HR employees with "Resignation" in the subject line. [DE 132-3]. Notably, the content of the email was very clear that Ms. Barney was giving her two weeks' notice and was officially leaving Zimmer. In the email Ms. Barney states the following:

> "Effective November 11, 2016 (or sooner if you choose), I will resign from Zimmer Biomet. I feel that this action on my part is necessary and the right thing to do for the company …. It has been an honor to work with the many talented and dedicated individuals that I have interacted with over nearly 10 years. Thank you for making me part of your family."

[DE 133-27]. Her email cannot be read as one where she is "raising her hand" to leave or asking for help in determining the best exit strategy. As Ms. Barney claims, despite being similarly situated within Zimmer, no one in Human Resources, including Mr. Fisher, tried to persuade her to stay longer. Ms. Barney argues that she specifically sent her resignation to Mr. Fisher and not to Mr. Dvorak, the CEO, in order to provide him with the opportunity to reach out and try to get her to stay. [Ex. D, Barney Dep. 458:6-23]. But her email does not communicate the concept that Ms. Barney is *possibly* leaving or *thinking* about leaving or *asking* for help in leaving with a package, instead it very clearly states she is resigning and gives her two weeks' notice. [DE 132-

3]. The Zimmer Severance Plan states that employees are not eligible to receive severance benefits if there is a "[v]oluntary termination of employment or retirement, or resignation of employment before a job-end date that has been specified by the Company." [DE 133-37 at 3]. Moreover, Ms. Barney's resignation came within the two years following the merger of Biomet and Zimmer, which also left her ineligible for severance benefits under the Biomet CIC Agreement. [DE 132-4 at 4].

While Mr. Kleopfer's and Mr. Boren's roles were somewhat comparable to Ms. Barney's role within Zimmer, their conduct when considering and communicating with the company that they were prepared to leave was significantly different. The problem with Ms. Barney's reliance on these two men as comparators is that they left their employment with Zimmer in a very different manner than she did. The distinction in *how* they initiated their exit from Zimmer and how they ultimately did leave Zimmer is significant given that it explains the different severance or exit packages (or lack thereof) they each received from Zimmer. See *Barbera v. Pearson Educ., Inc.*, No. 1:16-cv-2533-JMS-DML, 2017 WL 6616586, at *9 (S.D. Ind. Dec. 28, 2017), *aff'd*, 906 F.3d 621 (7th Cir. 2018). Thus, a major "differentiating or mitigating circumstance" distinguished Zimmer's treatment of individuals who immediately resigned from Zimmer like Ms. Barney as compared to other individuals who were terminated like Mr. Boren or who negotiated an exit package like Mr. Kleopfer. Ms. Barney's immediate resignation from Zimmer constitutes a differentiating circumstance such that her identified comparators are not similarly situated to her. Moreover, Ms. Barney failed to identify any male co-worker who immediately resigned from Zimmer and also received a severance package.

When considering all the evidence, the Court does not find that either Mr. Kleopfer or Mr. Boren were similarly situated or treated more favorably than Ms. Barney. McDonald, 427

U.S. at 283 n.11 (quoting *McDonnell Douglas,* 411 U.S. at 804). Under the Zimmer Severance

Plan, an employee who resigns is not eligible for severance benefits. Mr. Kleopfer and Mr.

Boren were not treated more favorably than Ms. Barney—they simply did not outright resign and

thus the policies regarding resignations did not apply to them.

### 3.   Considering the Evidence of Discrimination under *Ortiz*

Finally, even considering Ms. Barney's arguments outside the confines of the *McDonnell*

*Douglas* framework and the similarly situated co-worker analysis, when viewing the evidence in

the light most favorable to Ms. Barney, she has not offered evidence that, when viewed as a

whole, permits an inference of discrimination. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760,

765 (7th Cir. 2016). Simply put, Ms. Barney has offered no evidence that her gender had

anything to do with her alleged constructive discharge or the denial of her severance package.

And, even if Ms. Barney was right that Zimmer or at least the employees in the HR department

made no effort to get her to stay longer, nothing suggests that this was a result *of her sex*, which

is the relevant question. *See Owens v. Old Wisconsin Sausage Co., Inc.*, 870 F.3d 662, 667 (7th

Cir. 2017). Ms. Barney clearly stated that she did not include Mr. Dvorak on her resignation

email in order to give HR employees Mr. Fisher and Mr. Heeter an opportunity to reach out to

her. The facts do not suggest that either Mr. Fisher or Mr. Heeter had any animus towards Ms.

Barney, and, in fact, they seemed to be supportive of her when compared to other employees at

Zimmer. [DE 132-14]. Zimmer has clearly demonstrated that severance package decisions are

based on policy and Ms. Barney was unable to demonstrate otherwise. Accordingly, the Court

concludes that a reasonable jury could not infer that Zimmer treated similarly situated employees

more favorably than Ms. Barney nor that her termination, as well as the failure of human

resources to respond differently to her resignation, was based upon her gender.

The Court finds that Ms. Barney has not presented evidence from which a jury could find that she was constructively discharged because of her sex as she claims. She also has not offered evidence from which the jury could find that Zimmer's explanation for not providing her with severance was based on her gender or that Zimmer treated comparable male co-workers more favorably than her. When viewing the evidence collectively, *Ortiz*, 834 F.3d at 765, it fails to point to Ms. Barney's sex as the reason for her alleged constructive discharge and denial of severance. "To avoid Title VII sex-discrimination liability, [the Defendant] did not need to make wise or even generally fair decisions, so long as it did not discriminate on the basis of sex." *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 630 (7th Cir. 2018). The Court finds that to be the case here, Ms. Barney cannot demonstrate that her treatment was discrimination on the basis of sex. Accordingly, the Court must grant Zimmer's motion for summary judgment on Ms. Barney's Title VII claim.

### B. Ms. Barney's Equal Pay Claim

Although Ms. Barney's claims here are essentially identical—and she has treated them identically—the Equal Pay Act (EPA) and Title VII present independent remedies, and Title VII's coverage of equal pay claims is broader than the EPA's. *Cullen v. Ind. Univ. Bd. of Trustees*, 338 F.3d 693, 703 (7th Cir. 2003) (citing *Washington County v. Gunther*, 452 U.S. 161, 178-80 (1981)). Thus, the Court will address Ms. Barney's EPA claim separately. Ms. Barney's EPA claim is premised on her theory that similarly situated male executives were awarded severance when she was denied it. The Equal Pay Act prohibits employers from paying employees different wages based on gender. 29 U.S.C. § 206(d); *Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir. 2008). To establish a prima facie case of wage discrimination under the EPA, a plaintiff must show, by a preponderance of the evidence, that "(1) higher wages were

paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Id.* No proof of discriminatory intent is required. *Id.*; *Cullen,* 338 F.3d at 699.

If Ms. Barney establishes a prima facie case, the burden then shifts to Zimmer to establish one of four statutory defenses, "which kick in if the difference in pay is attributed to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Warren*, 516 F.3d at 620; 29 U.S.C. § 206(d). The last exception is a "broad, 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex." *Warren*, 516 F.3d 620 (quoting *Fallon v. Illinois*, 882 F.2d 1206, 1211 (7th Cir.1989)). In other words, the EPA establishes a rebuttable presumption of sex discrimination where an employee shows that an employer pays members of one sex less than members of the opposite sex; and the employer can rebut the presumption by offering a gender-neutral justification for doing so. *Id.* at 629. The justification need not be a "good reason," but it has to be bona fide and gender neutral – the employer "cannot use a gender-neutral factor to avoid liability unless the factor is used and applied in good faith." *Id.* (quoting *Fallon*, 882 F.2d at 1211). Here, Zimmer relies on the fourth factor and argues that any differential in severance benefits received by Ms. Barney and her alleged comparators was based on factors other than gender.

As the Court noted in the previous section, it does not recognize Mr. Kleopfer or Mr. Boren to be male comparators to Ms. Barney. But even if the Court found them to be relevant comparators to Ms. Barney, her EPA claim would still fail for the same reasons her Title VII claim failed—she cannot demonstrate that the denial of severance was based on her gender. The differences between Ms. Barney and these two men are related to how they left Zimmer, which

directly impacted what severance polices were applied to them and what benefits they received. Ms. Barney officially resigned and was not asked to stay on at Zimmer. Mr. Kleopfer indicated that he was planning to leave Zimmer and HR employees worked with him to delay his official resignation by several months. Mr. Boren also indicated that he was planning to leave Zimmer and the company let him go immediately. Zimmer's severance policy addresses each of these circumstances and when providing severance is allowed in each instance.[5] Even Mr. Fisher, who spoke very highly of Ms. Barney, stated that she was treated 100% consistently with company policy. [Ex. E, Fisher Dep. 197:18-21]. Mr. Fisher and Mr. Cultice reviewed the provisions of Ms. Barney's Employment Agreement, which specifically stated that she would waive her right to cash severance benefits which she was entitled to under the Biomet CIC Agreement if she terminated her employment during the two years following the merger. [DE 136-16; 132-4]. Thus, under both companies' policies, she was not eligible for severance benefits.

Ms. Barney has provided no evidence of another male employee, similarly situated to her, who immediately resigned and also received a severance package. Moreover, Zimmer has put forth evidence that the difference in severance benefits was based on a factor other than sex; specifically, the difference was based on how the employees left their employment with Zimmer. Ms. Barney has not put forth evidence to place the facts surrounding that rationale in dispute. Therefore, summary judgment is appropriate based on Zimmer's affirmative defense of the severance benefits being based on a "factor other than sex." *See* 29 U.S.C. § 206(d)(1)(iv).

---

[5] In his deposition, Mr. Fisher agreed that a presentation was created demonstrating the "options for different forms of payment to Mr. Kleopfer including considering a mutually agreed separation, or an involuntary termination, or a retirement and various compensation that would flow from each of those decisions." [Ex. E, Fisher Dep. 100:5-11].

V.     **CONCLUSION**

For the foregoing reasons, the Court GRANTS Zimmer's motion for summary judgment as to Count I and Count II. The Clerk is **DIRECTED** to enter judgment in favor of the Defendant.

SO ORDERED.


ENTERED:  July 29, 2021


        /s/ JON E. DEGUILIO
Chief Judge
United States District Court